**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JUDY ANN SHOWERS,** | : | |
| | : | |
| **Petitioner** | : | **NO: 3:CV-03-2264** |
| | : | |
| **v.** | : | **(Judge Caputo)** |
| | : | |
| **JEFFREY BEARD, Commissioner,** | : | |
| **Pennsylvania Department of** | : | |
| **Corrections; MARTIN** | : | |
| **DRAGOVICH, Warden of the State** | : | |
| **Correctional Institution at Muncy,** | : | |
| | : | |
| **Respondents** | : | |

## MEMORANDUM

### INTRODUCTION

Petitioner Judy Ann Showers ("Showers"), an inmate currently incarcerated at

the State Correctional Institution in Muncy, Pennsylvania, commenced this action by

filing a counseled petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

(Doc. 1.)  Showers is challenging her conviction and sentence in the Court of Common

Pleas of Northumberland County, Pennsylvania, with claims of ineffective assistance of

counsel and trial court error.  For the reasons that follow, the petition will be granted as

to Claim I, which relates to ineffective assistance of trial counsel for failing to present

rebuttal expert testimony.  The case will be remanded to the Commonwealth of

Pennsylvania to conduct further proceedings in a manner consistent with this

Memorandum.

### BACKGROUND

On March 23, 1994, Showers was found guilty of first degree murder following a

jury trial in the Court of Common Pleas of Northumberland County, Pennsylvania ("trial

court" or "Northumberland county court").  The relevant facts were summarized by the

Pennsylvania Superior Court as follows:

> On September 2, 1992, state police Trooper Robert McBride
> responded to the scene of an apparent suicide at the residence of
> [Showers] and her husband, Delbert Showers, whose body was found
> lying on their couch.  Norman Showers, the deceased's brother, had
> already arrived on the scene and discovered what appeared to be a
> suicide note under the body.  The note explained the deceased's reasons
> for committing suicide and what drugs he took to accomplish it.  The
> deceased died of an oral overdose of a mixture of Serax, an anti-
> depressant drug, and liquid morphine.  The Serax was obtained by
> prescription, while the morphine had been taken from Helen Wolfe, a
> friend of the Showers and the former lover of the deceased.

> On the day of her husband's death, [Showers], a licensed practical
> nurse, had been alone in the house with him.  During Trooper McBride's
> investigation, the police determined that the note was not written by the
> deceased.  In February of 1993, Trooper McBride again interviewed
> [Showers] who admitted that she wrote the note because she feared she
> would be accused of killing her husband.  Based upon inconsistencies in
> her story and other information which she provided, [Showers] was
> charged with first degree murder.

> At trial, the Commonwealth introduced evidence of [Showers']
> motive for the killing.  At the time of his death, the deceased was
> romantically involved with Sylvia Knecht, the younger sister of Helen
> Wolfe. [Showers] knew of this affair.  Years earlier, [Showers] had also
> discovered his affair with Helen Wolfe.  In addition, there was evidence
> that [Showers] herself had in the past been involved in extramarital
> relations.  There were also indications of a financial motive, evidence to
> the effect that although the deceased was financially well-off, he was
> "tight" with money.

> [Showers] attempted to establish that the death was a suicide by
> evidence that the deceased had sought treatment for depression in the
> past, and that he had discussed suicide.

*Commonwealth v. Showers*, 681 A.2d 746, 749 (Pa. Super. 1996) ("*Showers-I*").

Immediately following the announcement of the verdict, Showers was sentenced by the

trial court to a term of life imprisonment without parole.  On April 4, 1994, she filed post-

sentencing motions, which were denied.  After obtaining new appellate counsel, on May 4, 1995, Showers filed a concise statement of matters complained of on appeal pursuant to the trial court's order under Pennsylvania Rule of Appellate Procedure 1925(b).  By opinion dated September 12, 1995, the trial court denied all issues presented in that appeal.

Represented by new appellate counsel, William C. Costopoulos, Esquire, Showers timely filed a direct appeal to the Pennsylvania Superior Court, raising eight (8) issues total.  Six of those issues pertained to trial court error during the guilt phase of the trial.  In particular, Showers claimed the trial court erred in permitting the Commonwealth to introduce evidence of her bad reputation for truthfulness.  *Showers-I*, 681 A.2d at 749.  Further, Showers set forth one ineffective assistance of counsel claim alleging that trial counsel did not extensively cross-examine the Commonwealth's expert witness who had testified that the deceased was not a suicide risk.  *Id*.

The Superior Court affirmed the judgment of sentence upon direct appeal in an opinion dated June 20, 1996.  *Id*.  A petition for allowance of appeal was denied by the Pennsylvania Supreme Court on November 27, 1996.  *Commonwealth v. Showers*, 685 A.2d 544 (Pa. 1996).  The United States Supreme Court denied a petition for writ of certiorari on May 12, 1997.  *Showers v. Pennsylvania*, 520 U.S. 1213 (1997).

On May 11, 1998, new appellate counsel, Caroline M. Roberto, Esquire, filed a petition for collateral relief on behalf of Showers under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541 *et seq*.  In her PCRA petition, Showers raised claims of ineffective assistance of trial counsel for: (1) failing to present

3

expert testimony to rebut the Commonwealth's expert testimony regarding: the ability to disguise the taste of liquid morphine; the voluntary and physiological characteristics of swallowing; and results of the autopsy; (2) failing to object to the impermissible opinion testimony of the coroner that the manner of death was homicide; (3) failing to object to the Commonwealth's expert reading verbatim into the record the "criminal history" provided to him by the coroner; (4) failing to object to the testimony of Trooper Robert McBride regarding his growing "suspicions" that the case was not a suicide; and (5) failing to file a motion to suppress evidence of bank records and tax returns.  (Doc. 1 at 5.)  Showers also set forth an underlying claim of ineffectiveness of appellate counsel for failing to raise any of the foregoing issues on direct appeal.

A full evidentiary hearing on the PCRA petition was held before the Honorable Samuel C. Ranck in the Northumberland county court on August 11 and September 24, 1998.  On January 7, 2000, the PCRA court denied the PCRA petition.[1]  (Doc 23 at 2-11.)

Showers' timely appeal to the Pennsylvania Superior Court raised the following

_____

[1] In its opinion denying Showers' appeal from that PCRA court decision, the Pennsylvania Superior Court noted that the PCRA court initially denied relief in an order and opinion dated April 16, 1999. *Commonwealth v. Showers*, 782 A.2d 1010, 1013 (Pa. Super. 2001).  The PCRA court again denied the PCRA petition on January 7, 2000.  *Id*.  A notice of appeal from that order was filed on January 28, 2000.  *Id*.  The Superior Court remanded the case on June 12, 2001, to the PCRA court for expansion of the record for an explanation of the entry of two substantially identical orders.  *Id*.  As a result, the PCRA court determined that the first opinion and order had not been served upon either defense counsel or upon the Commonwealth, and therefore, by order dated June 27, 2001, vacated the April 16, 1999, order.  *Id*.  The Superior Court noted that since the PCRA court retained inherent authority to correct court orders that would produce unfair results, the appeal before the Superior Court was properly before it.  *Id*. (citing *Jackson v. Hendrick*, 746 A.2d 574, 576-77 (2000)).

4

issues:

> [1.]    Whether trial counsel provided ineffective assistance of counsel under the state and federal constitutions where he failed to: (A) investigate and pursue a forensic, medical - scientific defense and call an available forensic pathologist to establish that the prosecution's theory of homicide was impossible in light of forensic analysis of its own immutable physical evidence, which also proved the manner of death was suicide; (B) object to the Coroner's improper expert opinion that the manner of death was homicide, based upon his detailed recap of the police investigation and on-going thought processes of investigator's; (C) object to the prosecution's pathologist's improper so-called "clinical history" of the case, another "recap" of the investigation; (D) object to yet another "recap" of the investigation by the final witness, a state trooper, whose recap and explanation of his thought processes was essentially a preview of closing argument, but, largely, not evidence; and (E) to move to suppress illegally obtained bank records and tax returns.

* * *

> [2.]    Whether new appellate counsel provided ineffective assistance of counsel under the state and federal constitutions where he failed to raise any of the foregoing instances of trial counsel's constitutionally inadequate representation, which appellate counsel correctly believed to be of arguable merit.

Showers' Brief to the Pennsylvania Superior Court, 2000 WL 34486395, at *3 (Sept. 15, 2000).

On August 20, 2001, the Superior Court affirmed the judgment of the PCRA court. *Commonwealth v. Showers*, 782 A.2d 1010 (Pa. Super. 2001) ("*Showers-II*"). In its discussion, the Superior Court initially addressed the standard for demonstrating appellate counsel's ineffectiveness, stating that "[u]nless [Showers] proves by a preponderance of the evidence that Mr. Costopoulos was ineffective for not raising the five issues identified in this appeal, she is entitled to no relief." *Id.* at 1015. Further, the court stated that under 42 PA. CONS. STAT. ANN. § 9543(a)(4), it was Showers' burden

5

to show that Mr. Costopoulos' decision to raise only eight issues for review on direct appeal could not have been the result of "any rational, strategic or tactical decision by him." *Id*. After reviewing the issues raised by Mr. Costopoulos and his PCRA testimony regarding his reasons for not including certain issues in the direct appeal, the Superior Court determined that Showers had not sustained her burden of proof under the PCRA to show that Mr. Costopoulos' course of action did not have a "rational, strategic, or tactical" basis. *Id*. at 1019. The court further found that none of the allegations of error raised in the additional claims presented "an issue of significant arguable merit." *Id*. In doing so, the court addressed the merits of those claims. *Id*. at 1019-1022. Consequently, the court concluded that appellate counsel could properly choose not to pursue those issues through the "exercise of valid tactical strategy." *Id*. at 1019. Showers filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which was denied by order dated December 30, 2002. *Commonwealth v. Showers*, 814 A.2d 677 (Pa. 2002).

On December 11, 2003, Showers timely filed the instant petition for writ of habeas corpus in which she alleges four claims of ineffective assistance of counsel and one claim of trial court error. Specifically, those claims are set forth as follows:

A.      Ineffective assistance of counsel in violation of the Sixth
        Amendment of the Constitution of the United States, in that:

1.  Trial counsel failed to present at trial expert testimony from an available forensic pathologist to rebut testimony by prosecution expert, Isidore Mihalikis, M.D., regarding the ability to disguise the liquid morphine Roxanol, which caused the death of Delbert Showers; to explain to the jury the voluntary nature and physiological characteristics of swallowing; and to explain that the autopsy results failed to support either surreptitious oral administration of Roxanol or forced swallowing, and appellate counsel

6

failed to preserve the issue on appeal,

    2.  Counsel failed to object to the impermissible opinion testimony of Northumberland County Coroner Richard Ulrich that the manner of death in this case was homicide, and appellate counsel failed to preserve on appeal,

    3.  Counsel failed to object to and raise on appeal Dr. Mihalikis' testimony wherein he reviewed for the jury and read verbatim the "criminal history" which was provided to him by Coroner Ulrich and which contained triple hearsay; was completely irrelevant to the determination of the cause of death,

    4.  Counsel failed to object to and raise on appeal the testimony of Trooper Robert McBride regarding his growing "suspicions" that the case was not a suicide and regarding his irrelevant, prejudicial and impermissible editorial comments on the evidence as "curious" and "suspicious," and

B.    The trial court erred by permitting the prosecution to call several character reputation witnesses to testify that the petitioner had a reputation for dishonesty when she did not place the honesty of her character into evidence; where the testimony was based on knowledge 10 to 15 years old and thus remote; and one witness improperly and prejudicially testified that petitioner was fired from her nursing job and was not trusted by the hospital staff.

(Doc. 1.)  Respondents responded to the habeas petition on February 5, 2004.  (Doc. 9.)  Showers filed her reply brief on February 26, 2004.  (Doc. 13.)  This matter is now ripe for disposition.

**DISCUSSION**

**I.**    **Standards of Review**

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of her confinement.  *Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle v.*

*McGuire*, 502 U.S. 62, 67-68 (1991).  Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68; *see also Johnson v. Rosemeyer*, 117 F.3d 104, 109 (3d Cir. 1997).

Before a court may review a § 2254 petition, the petitioner must demonstrate exhaustion of state court remedies and lack of procedural default.[2]  Only then may the court examine the merits of the petition.

## A.    Exhaustion and Procedural Default

Habeas corpus relief cannot be granted unless all available state remedies have been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant.  *See* 28 U.S.C. § 2254(b)(1).  The exhaustion requirement is grounded on principles of comity in order to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions.  *See Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

To satisfy the statutory requirements, a federal habeas petitioner must have presented the facts and legal theory associated with each claim through "one complete

---

[2] 28 U.S.C. § 2254(b)(1) provides the following:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
(A) the applicant has exhausted the remedies available in the courts of the State; or
(B)(i) there is an absence of available State corrective process; or
(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526

U.S. 838, 845 (1999); *see also Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004).  It

is not necessary for a petitioner seeking federal habeas relief to present his federal

claims to state courts *both* on direct appeal *and* in a PCRA proceeding.  *Swanger v.

Zimmerman*, 750 F.2d 291, 295 (3d Cir. 1984).

A petitioner bears the burden of demonstrating that he has "fairly presented" his

claims to the state's highest court, either on direct appeal or in a state post conviction

proceeding.[3]  *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997); *see also

McMahon v. Fulcomer*, 821 F.2d 934, 940 (3d Cir. 1987).  A petitioner fairly presents

his claim when he presents the same factual and legal basis for the claim to the state

courts.  *Nara v. Frank*, 488 F.3d 187, 197-98 (3d Cir. 2007); *see also Duncan v. Henry*,

513 U.S. 364, 366 (1995).  In addition, the state court must be put on notice that a

federal claim is being asserted.  *Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001).

If a petitioner presents unexhausted habeas claims to a federal court, but state

procedural rules bar further state court review, the federal court will excuse the failure to

exhaust and treat the claims as exhausted.  *Wenger v. Frank*, 266 F.3d 218, 223 (3d

Cir. 2001); *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000); *see Teague v. Lane*, 489

U.S. 288, 297-98 (1989).  Although deemed exhausted, such claims are considered

procedurally defaulted.  *Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *Lines*, 208

---

[3] Pursuant to Pennsylvania Supreme Court Order 218, effective May 9, 2000, issues presented to the Pennsylvania Superior Court are considered exhausted for the purpose of federal habeas corpus relief under section 2254. *See In re: Exhaustion of States Remedies in Criminal and Post-Conviction Relief Cases*, No. 218, Judicial Administration Docket No. 1 (May 5, 2000) (per curiam).

F.3d at 160.

A federal habeas court cannot review the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999); *Coleman*, 501 U.S. at 750; *Caswell v. Ryan*, 953 F.2d 853, 857, 861-62 (3d Cir. 1992). To demonstrate cause for a procedural default, the petitioner must show that some objective external factor impeded petitioner's efforts to comply with the state's procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, the petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting [the entire proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger*, 266 F.3d at 224. The miscarriage of justice exception applies only in extraordinary cases where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

Even when a petitioner properly exhausts a claim, a federal court may not review it on the merits if a state court's decision rests on a violation of a state procedural rule that is independent of the federal question presented and adequate to support the

10

judgment.  *Whitney v. Horn*, 280 F.3d 240, 252-53 (3d Cir. 2002); *Leyva v. Williams*,

504 F.3d 357, 365-66 (3d Cir. 2007).

Further, if a respondent in a federal habeas proceeding fails to raise the issue of

procedural default, the court may do so *sua sponte*.  *Yeatts v. Angelone*, 166 F.3d 255,

261-62 (4th Cir. 1999) (citing *Hull v. Freeman*, 932 F.2d 159, 164 n.4 (3d Cir. 1991),

*overruled on other grounds by Caswell v. Ryan*, 953 F.2d 853 (3d Cir. 1992).

Moreover, a federal habeas court may decide that a habeas petitioner has procedurally

defaulted a claim even though no state court has previously decided that the claim was

procedurally barred under state law.  *See, e.g.*, *Carter v. Vaughn*, 62 F.3d 591, 595 (3d

Cir. 1995) (requiring the federal district court to determine whether the petitioner's

failure to appeal in the state court constituted a waiver under state procedural law that

barred state courts from considering the merits and, therefore, constituted a procedural

default for habeas purposes even though no state court had made a determination that

petitioner's failure to appeal constituted waiver under state law); *Chambers v.

Thompson*, 150 F.3d 1324, 1327 (11th Cir. 1998).

In the instant case, it is clear that the first time Showers asserted that her trial

counsel was ineffective for failure to raise the issues presented in this habeas petition

was in her PCRA petition.  Arguably, such claims were "waived" under state law, which

required at the time of her direct appeal that ineffectiveness of counsel "be raised as an

issue at the earliest stage in the proceedings at which the counsel whose

ineffectiveness is being challenged no longer represents the defendant."

11

*Commonwealth v. Hubbard*, 372 A.2d 687, 695 n.6 (Pa. 1977).[4]  The first opportunity for challenging the effectiveness of trial counsel on the issues presented in the instant petition was on direct appeal, and Showers' appellate counsel did not raise these claims.  Showers nonetheless preserved the instant claims by challenging in her PCRA petition the ineffectiveness of appellate counsel for failing to raise these ineffectiveness of trial counsel claims.  Moreover, in its decision on whether Showers' appellate counsel provided ineffective assistance, the Pennsylvania Superior Court addressed the merits of Showers' claims of ineffective assistance of trial counsel.  *See Showers II*, 782 A.2d at 1019-22.  Thus, this Court concludes that Showers has preserved her instant challenges of ineffectiveness of trial counsel, and the Court is not foreclosed from addressing those issues on the merits.

### B.    Merits

Section 2254(d) of Title 28 of the United States Code provides, in pertinent part, that an application for a writ of habeas corpus premised on a claim previously adjudicated on the merits in state court shall not be granted unless:

---

[4] Since Showers' direct appeal, the law of *Commonwealth v. Hubbard*, 372 A.2d 687 (Pa. 1977) (holding claims of ineffective assistance of counsel must be brought at the first change of counsel), has changed, *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002) (holding claims of ineffective assistance of counsel may only be brought collaterally).  However, the holding of *Grant* is retroactive only to cases which were pending at the time or cases in which a claim of ineffectiveness of trial counsel had been properly raised and preserved.  *Id*. at 738.  In *Commonwealth v. Bethea*, 828 A.2d 1066 (Pa. 2003), the Pennsylvania Supreme Court clarified the retroactive application of *Grant*, stating that *Grant* does not apply to claims of ineffective assistance of counsel where the intermediate appellate court rendered a merits disposition prior to the issuance of the decision in *Grant*.  *Bethea*, 828 A.2d at 1070 n.2.  In the instant case, disposition on all of Showers' ineffectiveness claims by the intermediate appellate state courts had been completed prior to the issuance of *Grant*.  Thus, *Grant* was not applicable to those claims.

> (1) [the decision] was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) [the decision] was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  To establish that the decision was contrary to federal law, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome." *Matteo v. Superintendent*, 171 F.3d 877, 888 (3d Cir. 1999) (emphasis in original).  Similarly, a federal court will only find a state court decision to be an unreasonable application of federal law if the decision, "evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id*. at 890.

Further, under 28 U.S.C. § 2254(e)(1), a federal court is required to presume that a state court's findings of fact are correct.  A petitioner may only rebut this presumption with clear and convincing evidence of the state court's error. *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions); *Matteo*, 171 F.3d at 888; *Thomas v. Varner*, 428 F.3d 492, 497-98 (3d Cir. 2005).  This presumption of correctness applies to both explicit and implicit findings of fact.  *Campbell v. Vaughn*, 209 F.3d 280, 285-86 (3d Cir. 2000).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." *Mastracchio* v. Vose, 274

F.3d 590, 598 (1st Cir. 2000).

Like the "unreasonable application" prong of paragraph (1), a factual

determination should be adjudged "unreasonable" under paragraph (2) only if the court

finds that a rational jurist could not reach the same finding on the basis of the evidence

in the record.  28 U.S.C. § 2254(d)(2); *Porter v. Horn*, 276 F. Supp. 2d 278, 296 (E.D.

Pa. 2003); *see also Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000); *cf.*

*Jackson v. Virginia*, 443 U.S. 307, 317 (1979).  "This provision essentially requires the

district court to step into the shoes of an appellate tribunal, examining the record below

to ascertain whether sufficient evidence existed to support the findings of fact material

to the conviction."  *Breighner v. Chesney*, 301 F. Supp. 2d 354, 364 (M.D. Pa. 2004)

(citing 28 U.S.C. § 2254(d)(2) and (f)[5].  Mere disagreement with an inferential leap or

credibility judgment of the state court is insufficient to permit relief.  *Porter*, 276 F. Supp.

2d at 296; *see also Williams v. Taylor*, 529 U.S. 362, 410 (2000); *Hurtado v. Tucker*,

245 F.3d 7, 16 (1st Cir. 2001).  Only when the finding lacks evidentiary support in the

state court record or is plainly controverted by evidence therein should the federal

habeas court overturn a state court's factual determination.  *Porter*, 276 F. Supp. 2d at

296; *see also Williams*, 529 U.S. at 408-10.

Finally, the United States Supreme Court has clarified the test a district court

must apply before granting relief where the court finds constitutional error:

---

[5] "If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination."  28 U.S.C. § 2254(f).

> [I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

*Fry v. Pliler*, ___ U.S. ___, ___, 127 S. Ct. 2321, 2328 (2007).  Thus, even if the Court concludes that constitutional error occurred in the state court, the Court may not grant relief unless the error "had a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 631; *see also Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008).

## II.    Merits Analysis

Showers' habeas petition contains five claims for relief, four of which allege ineffective assistance of trial and appellate counsel.  Specifically, in her first claim Showers contends that trial counsel was ineffective for failing to present an expert witness to rebut the Commonwealth's expert witness testimony with respect to the characteristics of the liquid morphine, Roxanol.  Because the Court finds this claim to have merit, and thus Showers is entitled to relief from her conviction for first-degree murder, this Court need not address the remaining claims.

### A.    Ineffective Assistance of Counsel

The Sixth Amendment guarantees an accused in a criminal prosecution the right to assistance of counsel for his defense.  The applicable federal precedent for ineffective assistance claims is the well-settled two-prong test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See also*

15

*Wiggins v. Smith*, 539 U.S. at 510, 521 (2003) (setting out the *Strickland* test); *Williams*, 529 U.S. at 390-91 (same).  The first prong of the *Strickland* test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521.  It follows that when a petitioner claims that his counsel failed to raise a claim that the court determines to be meritless, habeas relief under *Strickland* is not available.  *See Strickland*, 466 U.S. at 691 (failure to pursue "fruitless" claims "may not be challenged as unreasonable.")  A court must indulge a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;" that is, the petitioner must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy."  *Id.* at 688-89, 690-92.  The question is not whether counsel did not err, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place of counsel's conduct.  *Id.*

The second prong of *Strickland* requires a petitioner to show that "the deficient performance prejudiced the defense."  *Id.* at 687.  To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  This standard "is not a stringent one;" it is less demanding than the preponderance standard.  *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999).

16

Further, the reviewing court must evaluate counsel's performance in light of the totality of the evidence. *Strickland*, 466 U.S. at 695-96; *see also Jacobs v. Horn*, 395 F.3d 92, 106-07 (3d Cir. 2005).  It is the petitioner's burden to establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 697; *see also Jacobs*, 395 F.3d at 102.

At the time the state courts reviewed the claims that Showers' counsel was arguably ineffective, *Strickland*'s familiar two-pronged test was the "clearly established federal law" applicable to ineffective assistance of counsel claims.  Under Pennsylvania state jurisprudence, a three-prong test is applied to ineffective assistance of counsel claims, but is, in substance, identical to the *Strickland* test. *See, e.g.*, *Commonwealth v. Pierce*, 527 A.2d 973, 975-77 (Pa. 1987).  The Third Circuit has held that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to *Strickland*. *Jacobs*, 395 F.3d at 107 n.9; *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000).  Thus, under § 2254(d)(1), the relevant inquiry in assessing ineffectiveness claims that have been adjudicated on the merits is whether the state court's decision involved an unreasonable application of *Strickland*. *Jacobs*, 395 F.3d at 107 n.9; *Werts*, 228 F.3d at 204.  Further, under § 2254(d)(2), the relevant inquiry is whether the state court made unreasonable factual determinations when deciding whether the petitioner received constitutionally effective counsel. *Bond v. Beard*, 539 F.3d 256, 279 (3d Cir. 2008).

Finally, Showers' claims of ineffective assistance of appellate counsel must be examined under the same *Strickland* standards cited above: 1) counsel's performance

17

was unreasonable, and 2) counsel's unreasonable performance actually prejudiced the

defense.  *Strickland*, 466 U.S. at 687.

If a court finds no merit in a claim of ineffective assistance by trial counsel,

appellate counsel cannot be found ineffective for failing to raise those same meritless

issues on appeal.  *See United States v. Cook*, 45 F.3d 388, 392-93 (10th Cir. 1995)

("When a defendant alleges his appellate counsel rendered ineffective assistance by

failing to raise an issue on appeal, we examine the merits of the omitted issue.  If the

omitted issue is without merit, counsel's failure to raise it does not constitute

constitutionally ineffective assistance of counsel.") (citations and quotations omitted).

Stated otherwise, if there is no ineffective assistance of counsel at the trial level, there

can be no ineffective assistance of counsel on appeal for failure to raise the same

issue.  *See Jones v. Barnes*, 463 U.S. 745, 754 (1983) (finding a criminal defendant

has no constitutional right to insist that appellate counsel advance every non-frivolous

argument the defendant wants raised); *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir.

1996) (holding appellate counsel does not have a duty to raise every possible claim).

### 1.    Claim 1 - Ineffective Assistance of Counsel in Failing to Present Rebuttal Expert Testimony

Showers contends that she is entitled to habeas relief because trial counsel,

Michael Rudinski, Esquire, was ineffective for failing to investigate and present expert

testimony to rebut the Commonwealth's expert testimony regarding the ability to

disguise the taste of liquid morphine Roxanol, the voluntary nature of swallowing, and

the autopsy results which did not support a finding of forced swallowing.  Showers did

not raise this issue in her direct appeal.  Rather, she raised it in her PCRA petition in

18

conjunction with her claim that appellate counsel was ineffective for not raising this claim on direct appeal.  Before turning to an analysis of this claim, the Court will first recount the relevant testimony.

> ### a.    Trial

The Commonwealth presented the testimony of Isidore Mihalakis, M.D., a forensic pathologist who had performed an autopsy of the victim.  On direct examination, Dr. Mihalakis was asked if Roxanol is so bitter that it cannot be masked or disguised in any kind of food or drink.  (Notes of Testimony, Trial, 3/14-19, 21-23/1994 ("Trial NT") 854.)  Dr. Mihalakis responded in the negative, explaining that he had personally tasted Roxanol under controlled conditions, and "did not find it so bitter as to be incapable of being masked by strong coffee, orange juice, or something along those lines, or in liquor."  (Trial NT 855.)

On cross-examination, Attorney Rudinski asked Dr. Mihalakis if he had tried to disguise the Roxanol when he tasted it in order to determine if the taste could, in fact, be masked, and Dr. Mihalakis responded, "I tasted it to see what it tasted like, and based on the taste I felt that it could be disguised without any problem."  (*Id*. at 858.) He also stated, "I felt that the taste was not - - was not so bad that it could not be concealed."  (*Id*. at 859.)

Dr. Mihalakis also testified that during the autopsy he performed a dissection of the neck for evidence of aspirations, which he defined as "upchucking and then breathing the material into the upper airway."  (*Id*. at 872.)  When asked by Attorney Rudinski if aspirations would occur "if I took a liquid and poured it down someone's

throat when they're sleeping," Dr. Mihalakis explained that aspirations occur more commonly when a person is sleeping.  (*Id*.)  However, he noted that the autopsy revealed no signs of aspirations.  (*Id*. at 873.)

The Commonwealth also presented the testimony of Helen Wolfe, a close family friend of the Showers, who also gave an account of the taste of Roxanol.[6]  She stated,

> there is no way you can mask the taste of that medicine.  It would be like when somebody puts ammonia to your nose it takes your breath.  Well, when I was in the hospital I couldn't take it.  And they said, "That's not unusual.  Nobody can."  And they gave it to me in a little cup.  I mean there's like a half of teaspoon mixed with it, 30 cc's of orange juice, plus the containers that they use in the hospital full of juice as a chaser because it's really horrible.  But it is instant acting.

(*Id*. at 1044.)  Later in her testimony, Mrs. Wolfe stated that Delbert Showers was the person who administered Roxanol to her, and that he had asked several pharmacists about how to administer it properly.  She asserted, "He knows more about liquid Roxanol than I do and I'm a nurse."  (*Id*. at 1074.)

During his closing argument at trial, Attorney Rudinski addressed the Commonwealth's evidence regarding Roxanol and attempted to refute the expert testimony indicating that Delbert Showers could have ingested the Roxanol involuntarily.  He stated,

> The Commonwealth also called in a forensic pathologist.  He was a very important witness in this case, Dr. Isidore Mihalakis.  He came up from Allentown for them.  He did the autopsy.  He was extremely important.  He testified that he looked for needle marks to see if there was an injection site.  He found none.

---

[6] At the time of the death of Delbert Showers, Helen Wolfe had been previously diagnosed with multiple myeloma, and was prescribed Roxanol for pain management.  Mrs. Wolfe has since died.

But the most important thing he testified about was not brought up when he testified on direct examination, but on cross-examination. I asked him, "What's this stuff about aspirations in the throat? Why did you dissect that throat?" "To see if there was signs of aspirations." He told you that's - - "if you get a liquid in here it's like bringing it back up or if there's a problem there." They dissected the whole neck. They wanted to see if there was aspirations. They went to the lungs. They wanted to see if there was aspirations.

Do you know why? It's real reasonable. Somehow the Commonwealth thinks that Judy Showers took this liquid and got it down - - and you saw the cups he showed you how much liquid it would be - - and she poured that down this 250 pound man's throat somehow. Ask yourself. "If that's the key, how did that happen? How do you do that?"

Well, their theory is, "Well, gee, he had Serax there, too." So, "gee, he was out of his mind and drank this." Ladies and gentlemen, the testimony was so clear from their toxicologist and the other person we have - - you know, we have experts everywhere. But the toxicologist says it was a therapeutic amount of Serax.[7] Therapeutic amount. That's the amount you're supposed to take.

"It would be like a valium," he testified. He didn't say, "Well, you take one of these and you're gone. You just fall down and don't know what you're doing. You wouldn't know your surroundings. But if you were already tired, you may go to sleep."

So he's aware of his surroundings if he takes the Serax. If he's aware, how do we get this Roxanol in? Remember the testimony? Extremely bitter tasting. Helen Wolfe says, "I couldn't take it. I only took one dose with orange juice. I couldn't stand it." Never took it again.

But the doctor did his independent study. Put a little finger on it. "Well, that could be hidden." If he wanted to do a study for you, ladies and gentlemen, and he wanted to come in here and show you it could be hidden, what he should have done is mix it with something and said, "Gee, I mixed it with something, tasted it, and I couldn't taste nothing." He should have mixed an amount like this in a glass and said, "Now let me taste." He didn't do that.

---

[7] Theodore Siek, a toxicologist, testified on behalf of the Commonwealth that there was a therapeutic amount of Serax found in Delbert Showers which would not have caused him to fall asleep. (Trial NT 826-27.)

He's here for the Commonwealth.  Ladies and gentlemen, there is no way to explain how he got it in there or how she could have given him Roxanol without him knowing it.  The taste is there.  It's horrible.

The Serax - - are you going to tell me for a minute that she hid this Serax from him and snuck it in there so he couldn't see it?  Look at that glass.  That's what left.  Look at it.  Gee, he wouldn't have noticed that, would he?

Or did Delbert take it like he always took it, opening the capsules and putting them in.  And did he take this to relax a little bit to get enough nerve to kill himself?

You'll say he took so much Serax he fell asleep and took the Roxanol.  That's what the aspirations are for to make sure he didn't bring it back up.  There is no signs of it.  She couldn't have given it to him when he was asleep.  It tastes so horrible she couldn't give it to him when he was awake.  How did she do it?  They have their burden.  They're telling you she did it.  There is no way in the world to reconcile that point.  No way.  And that's the point they have to prove to you.

(*Id*. at 2002-05.)

The Commonwealth countered with the following during its closing argument at

trial:

Dr. Mihalakis.  The defense would have you believe that Dr. Mihalakis is a very important witness and that Dr. Mihalakis testified that he took the throat apart and there was no aspirations.  But I think Mr. Rudinski forgot to mention a few other things.

That Dr. Mihalakis, when he testified as to that Roxanol, and he testified that it was bitter, it was not for the purpose of showing you that Roxanol was simply bitter.  But it was for the purpose of showing it could be masked, and that was his testimony.

"Dr. Mihalakis, is this so bitter as has been alleged that it could not be masked?"  "No, I did my own control test on it.  I put it here, I tasted it.  It's not that bitter."  "How can you mask?  Are there any substances?"  "Sure, there are different substances.  Strong coffee," according to Dr. Mihalakis, "is one of the things that could have masked the Roxanol."

(*Id*. at 2042-43.)

### b.    PCRA Hearing

A two-day PCRA hearing was held in the Northumberland County court which included consideration of this claim.  Showers, represented by new counsel, presented several witnesses in support of her claim.

Showers first presented the testimony of Cyril H. Wecht, M.D., a forensic pathologist.  Dr. Wecht testified that he had knowledge of the taste of Roxanol, and that he knew it to have an extremely bitter taste, "noxious . . . extremely unpleasant, unpalatable to the taste."  (Notes of Testimony, PCRA Hearing, 8/11/1998 ("PCRA NT 8/11/98") 15.)  He stated that Roxanol could be disguised with a large amount of a sweet-tasting substance or possibly strong, bitter coffee.  (*Id*. at 27.)  After reviewing the autopsy report in this case, Dr. Wecht found that in order to disguise the large amount of Roxanol found in Delbert Showers, the Roxanol would have to have been administered with a substantial amount of food substance with an overpowering taste.  (*Id*. at 25.)  However, the autopsy report noted no evidence of any such diluting or masking substance.  (*Id*. at 26.)  In fact, the report noted that the contents of the stomach indicated little other than the Roxanol, including no sweet-tasting substance or coffee.  (*Id*.)  Moreover, the report indicated no injury to Delbert Showers that would show he had been forced to drink the Roxanol.  (*Id*. at 21-22.)  Based on these findings that the Roxanol was not disguised or forced upon Delbert Showers, Dr. Wecht opined, to a reasonable degree of medical certainty, that the Roxanol was taken by Delbert Showers on a voluntary basis.  (*Id*. at 12-13.)  Finally, Dr. Wecht indicated that had he been called to testify at trial he would have been willing to testify as to his conclusions

on Roxanol and the manner of Delbert Showers' death.  (*Id*. at 31.)

Showers also presented the testimony of Harry Doyle, M.D., a forensic psychiatrist who had testified at trial.  He had been retained by the defense prior to trial to obtain a psychiatric autopsy, a method of reviewing a victim's state of mind prior to death to aid in determining the manner of death.  Dr. Doyle performed an independent investigation of the ability to mask the taste of Roxanol because, due to the absence of evidence of force, the central issue in the case to him was whether the Roxanol had been taken voluntarily or had been surreptitiously administered.  (*Id*. at 48.)  He interviewed hospital pharmacists and nurses who had actually administered Roxanol and who told him that it had an extremely bitter taste that was difficult to disguise with another substance.  (*Id*. at 49-50.)  In addition, he contacted a pharmacologist at the drug's manufacturer, Roxanne Laboratories, who told him that the company had no recommended way to conceal the bitter taste.  (*Id*. at 50-51.)  Finally, he contacted the pharmacist who had prescribed the Roxanol used in this case who told him there is no way to disguise the bitter tasting Roxanol.  (*Id*. at 51-52.)

Once Dr. Doyle completed the report, he reviewed his results with Attorney Rudinski.  He communicated to Attorney Rudinski the need to call an expert witness to discuss the characteristics of Roxanol because he himself was not a toxicologist.  (*Id*. at 52-53.)  He also provided him with the names of three possible experts to address the taste of Roxanol.  (*Id*. at 56-57.)  However, at trial, Attorney Rudinski neither called such an expert witness nor questioned Dr. Doyle about his independent investigation with respect to Roxanol.

Attorney Rudinski testified at the PCRA hearing about his strategy with respect to presenting the characteristics of Roxanol.  He stated,

> [W]e wanted to show somehow that this drug was so bitter it couldn't be taken.  I had no one who could come forth and say that.  Dr. Doyle's intent in contacting anyone was to show that for his report.  And that is why his report doesn't say suicide, because we did not have someone who could come forth and do that.  The best person we had was Helen Wolfe to do that.  And almost every person that we had that - - a pharmacist or anyone else, was hearsay.  Someone told them it was bitter.  And I mean, it was really - - and then you ask them, could it be disguised, and they are going to say, I don't know.  People say it is very bitter, I don't know if it can.  For that reason, we brought Helen Wolfe in to show that it was bitter.  It was also - - it was our intent to show it was a suicide that Delbert - - I mean, the fact that there was no evidence of force, there was no evidence of needle marks or anything like that, was indicative of suicide rather than homicide.

(*Id*. at 85-86.)  Attorney Rudinski testified that his understanding from Dr. Doyle was that none of the medical professionals interviewed by him could confirm that the bitter taste of Roxanol could not be disguised.  (*Id*. at 65-66.)  Even though PCRA counsel pointed out that Dr. Doyle's report noted, "there is no known way to mask the bitter taste of Roxanol," (*Id*. at 66), Attorney Rudinski maintained that Helen Wolfe was the only person qualified to testify as to the bitter taste of Roxanol, because she had actually been prescribed the medicine and had taken it,[8] (*Id*. at 66-67).  Further,

---

[8] At the PCRA hearing, Attorney Rudinski justified his sole reliance on Helen Wolfe by stating that all the individuals interviewed by Dr. Doyle, as well as Dr. Mihalakis, "aren't even close to an expert as compared to Helen Wolfe was [*sic*].  She took it on a daily basis."  (PCRA NT 8/11/98 68.)  However, in his closing argument to the jury at trial, Attorney Rudinski recalled Helen Wolfe's testimony about the taste of Roxanol as follows: "'I couldn't take it.  I only took one dose with orange juice.  I couldn't stand it.  Never took it again.'"  (Trial NT 2003.)  Moreover, at trial Trooper McBride recalled the following about having asked Helen Wolfe about the Roxanol: "I knew she had this bottle of Roxanol for nine months, and she told me she only took one dose. . . . When she took the [Roxanol] she found it to be so bitter and - - it was fast acting, she liked that point - - but it was so bitter that she never took anymore."  (*Id*. at 1379.)

25

Attorney Rudinski stated that he did not independently follow up with any of those individuals; rather, he relied only on Dr. Doyle's report and "a pharmacist that I know up in Williamsport" for his conclusion that no one besides Helen Wolfe could account for the bitter taste of Roxanol.  (*Id*. at 67-68.)

Attorney Rudinski also testified about his cross-examination of Dr. Mihalakis. First, he claimed that he did not cross-examine Dr. Mihalakis about the absence of a disguising substance in the results from the autopsy of Delbert Showers because he recalled that there was some other type of fluid found in Delbert Showers' stomach.[9] Also, when asked why he did not question Dr. Mihalakis about the absence of evidence of forced administration of the Roxanol, Attorney Rudinski stated, "there are times that questions you don't know all of the answers to can be very dangerous."  (*Id*. at 72-73.)

### c.    State Court Decisions

The PCRA court denied the ineffective assistance claim.  (Doc. 23.)  The court found that Attorney Rudinski had made "diligent efforts" to locate an expert witness to provide testimony about the taste of Roxanol, and that he had "vigorously cross-examined" Dr. Mihalakis at trial.  (*Id*. at 4.)  The court further concluded that Showers failed to demonstrate that Dr. Wecht would have been physically able or available to testify, and that Showers had not elicited any testimony from Attorney Rudinski at the

---

Attorney Rudinski did not cross-examine Trooper McBride on that testimony.

[9] The autopsy report indicates that the only contents in the stomach were "scant mucoid, granular material with possibly some fragments of nuts such as peanuts (rare fragments); no unusual odors."  (Doc. 1-8 at 5.)  Further, Dr. Wecht specifically testified to the contents of Delbert Showers' stomach in his PCRA testimony.  As noted above, no possible disguising substance was found in his stomach.  (PCRA NT 8/11/98 26.)

PCRA hearing that he knew or should have known of Dr. Wecht.  (*Id.*)

The Pennsylvania Superior Court affirmed the denial of the ineffectiveness claim.
The court characterized Attorney Rudinski's cross-examination of Dr. Mihalakis as
"within the bounds of trial advocacy to be expected of an experienced criminal defense
attorney."  *Showers II*, 782 A.2d at 1021.  Specifically, the court found that it was
"reasonable for Mr. Rudinski to rely upon his cross-examination of the Commonwealth
expert in his demonstration of the weakness of the prosecution theory regarding the
manner of administration of the lethal drug."  *Id.*   The court also reasoned that "on the
basis of Mr. Rudinski's argument to the jury, this issue is not a substantial matter of
arguable merit."  *Id*.

Furthermore, the court concluded that testimony from a defense expert such as
Dr. Wecht would not created a reasonable probability that the outcome of the trial would
have been different, because "the gaps in the testimony of the Commonwealth's
forensic witness were competently exploited by defense counsel in closing argument."
*Id*.  In conclusion, the court stated,

> We see no reason to conclude that the jury would have reached a
> different verdict were it presented with an expert witness whose testimony
> would have provided the same basis for defense counsel to argue as did
> the expert of the Commonwealth.  There was no factual dispute
> concerning the bitter taste of the Roxanol, nor was there a dispute that the
> contents of the victim's stomach did not include a sweet substance, such
> as fruit juice, that would mask the taste of the Roxanol.  We will not find
> inevitably ineffective a defense that failed to refute with its own expert that
> which, arguably, had not been established by a Commonwealth expert
> witness.

*Id*.

The dissent provided a sharply contrary assessment of this ineffectiveness claim.

Initially pronouncing that the crucial issue in this case remains the state of mind of the victim, the dissent asked, "Unless the victim knew the nature of the substance and was determined to take his own life, would he or could he have ingested the admittedly bitter, unmasked toxic substance without being aware an attempt was being made to poison him?"  *Id*. at 1023.  The dissent recognized that the Commonwealth had offered substantial circumstantial evidence to prove its theory that Showers had either forcibly or surreptitiously administered the Roxanol to the victim.  Further, noting that the Commonwealth's expert, Dr. Mihalakis, had opined that Roxanol could be disguised by strong coffee, orange juice, or liquor, the dissent asserted that, "rebuttal testimony by an independent, credible expert witness was necessary to present to the jury the sharp, crucial contrast between voluntary and involuntary ingestion of a bitter toxic substance, the single most critical element of this case, as well as evidence or lack thereof relating to refluxation."  *Id*.  It also stated that "it was trial counsel's duty, in his role as a zealous advocate, to produce an expert rebuttal witness to counter the expert testimony of the Commonwealth's witness," and, "whose unbiased, knowledgeable testimony undoubtedly would have been far more convincing to the jury than that of a lay witness friend [Helen Wolfe]."  *Id*. at 1024.  Finally, it concluded that the record is devoid of "any serious attempt" by Attorney Rudinski to locate such an expert in time for trial.  *Id*.

### d.    Analysis of Ineffective Assistance of Trial Counsel

### i.    Deficient Performance

As stated above, *Strickland* imposes a two-part test for ineffective assistance of counsel claims. First, it asks whether counsel performed deficiently.  *Id*. at 687.  This

measures deficiency against the standard of "reasonably effective assistance," as defined by "prevailing professional norms."  *Id*. at 687-88.

Upon review, respectfully, this Court finds that the Pennsylvania Superior Court misapplied *Strickland* in concluding that counsel performed reasonably.  *See* 28 U.S.C. § 2254(d)(1).  Further, respectfully, the Court concludes that the Superior Court's holding rests in part on the inappropriate factual determination that trial counsel's cross-examination of Dr. Mihalakis effectively elicited testimony helpful to the defense, and that his closing argument to the jury negated the merit of the instant claim.  *See* 28 U.S.C. § 2254(d)(2).  This Court finds that the record includes evidence to the contrary.

As an initial matter, while this Court recognizes that this case does not involve the death penalty, the guidelines associated with defending a death penalty case are nevertheless instructive as to the role of defense counsel in preparing a defense in a criminal case potentially involving the use of a medical expert.  The failure to perform a meaningful investigation violates prevailing professional norms as stated in the American Bar Association's Guideline for Appointment and Performance of Counsel in Death Penalty Cases ("1989 ABA Guideline") 11.4.1, which addresses investigation in capital cases.[10]  The guideline instructs that "[c]ounsel should conduct independent investigations relating to the guilt/innocence phase," and that the "investigation[ ] should begin immediately upon counsel's entry into the case and should be pursued

---

[10] At the time of Showers' trial, the 1989 ABA Guidelines for capital defense work reflected the prevailing norms in the profession.  *See American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 1989, Introduction*, located at http://www.abanet.org/deathpenalty/resources/docs/1989Guidelines.pdf ("1989 ABA Guidelines").

expeditiously."  1989 ABA Guideline 11.4.1(A).  Further, the guideline sets forth a

number of sources of investigative information, including expert assistance.  It states,

> Counsel should secure the assistance of experts where it is necessary or
> appropriate for:
>
> A.      preparation of the defense;
>
> B.      adequate understanding of the prosecution's case; [and]
>
> C.      rebuttal of any portion of the prosecution's case at the guilt/innocence
>         phase . . . .

1989 ABA Guideline 11.4.1(D)(7).

The record reflects that prior to trial Attorney Rudinski did secure the assistance

of Dr. Doyle in investigating the state of mind of Delbert Showers at the time of his

death.  In performing that investigation, Dr. Doyle became aware that the administration

of the Roxanol was a crucial issue in the case.  However, he clearly indicated to

Attorney Rudinski that he did not have expertise in the area of Roxanol.  At that point, it

was incumbent upon Attorney Rudinski to produce such an expert.  The record reflects

little meaningful effort on his part to do so.  Instead, Attorney Rudinski relied on his

cross-examination of Dr. Mihalakis to raise doubts as to the administration of the

Roxanol.  He unsuccessfully questioned the doctor about his "taste test" of the Roxanol

in an attempt to persuade Dr. Mihalakis to hedge on his initial conclusions with respect

to the ability to mask the bitter taste of Roxanol.  Further, he did not present a rebuttal

defense expert who had encountered Roxanol and may have been asked to perform a

similar "taste test."  Even the pharmacist he contacted in Williamsport could have

performed such a "taste test" and made a finding about the ability to mask the taste of

Roxanol.  As such, the record does not support Attorney Rudinski's PCRA testimony

that no person aside from Helen Wolfe could account for the taste of Roxanol.

Furthermore, Attorney Rudinski's closing argument did nothing to negate the force of Dr. Mihalakis' testimony.  His argument simply posed a number of questions to the jury with respect to whether the Roxanol was surreptitiously administered to the victim by Showers.  The record shows that the jury was told on several occasions throughout the trial, including immediately prior to closing arguments, that attorney statements by no means constitute evidence.  (*See, i.e.*, Trial NT 1993-94.)  Therefore, the jury had already been put on notice that any factual conclusions set forth by counsel would not constitute evidence.  Thus, this Court respectfully disagrees with the Superior Court's conclusion that "the gaps in the testimony of the Commonwealth's forensic witness were competently exploited by defense counsel in closing argument."  *Showers II*, 782 A.2d at 1021.  This Court fails to see how Attorney Rudinski's statements made during closing argument were more effective or convincing in rebutting the testimony given by the Commonwealth's expert medical witness than testimony that could have been provided by a competing expert witness.

In sum, this Court concludes that Showers' trial counsel provided her deficient representation at trial.  As a result, the Superior Court's decision resulted in an outcome that cannot be reasonably justified under *Strickland*.  *See* 28 U.S.C. § 2254(d)(1); *see also Matteo*, 171 F.3d at 888.  Further, the Superior Court's factual determination that trial counsel meaningfully prepared for the guilt phase by relying solely on his cross-examination of the Commonwealth's expert and on his own closing argument is plainly controverted by the evidence in the state court record.  *See* 28 U.S.C. § 2254(d)(2); *see*

*also Porter*, 276 F. Supp. 2d at 296.  Trial counsel may have had communication with an expert prior to trial to discuss the crucial issues, namely Dr. Doyle, but once it was made known to him that Dr. Doyle could not provide testimony essential to rebut the Commonwealth's expert testimony, the record shows that he did not attempt further meaningful investigation prior to trial.  As such, trial counsel's performance fell below the objective standard of reasonableness required by *Strickland*.

### ii.    Prejudice

As noted above, to show prejudice under the *Strickland* test, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Again, this Court applies the AEDPA standard of review, asking whether the Pennsylvania courts applied *Strickland* in an objectively unreasonable way when they concluded that any deficient performance did not prejudice Showers.  *See Jacobs*, 395 F.3d at 106.

The Pennsylvania Superior Court did not find prejudice.  It concluded that "the gaps in testimony of the Commonwealth's forensic witness were competently exploited by defense counsel in closing argument."  *Showers II*, 782 A.2d at 1021.  The court also found that a rebuttal expert would not have aided the defense any more that the cross-examination or closing argument because the taste of Roxanol and the lack of a disguising substance in the victim's stomach were not in dispute.  *Id.*  As a result, the court concluded that Showers had not demonstrated that there is a reasonable probability that the outcome of the trial would have been different had any rebuttal

expert witness been presented by the defense.

Upon review, respectfully, this Court concludes that the Superior Court's determination that Showers failed to show prejudice cannot be reasonably justified under *Strickland*.  *See* 28 U.S.C. § 2254(d).  Competent counsel would have presented expert testimony to refute Dr. Mihalakis's conclusions, regardless of whether certain facts were or were not in dispute.  Certainly testimony from a competing expert on a crucial issue such as whether Roxanol could be forcibly or surreptitiously administered would have been more convincing than testimony from a close family friend.  Further, when backed with the strength of expert medical testimony, Showers' innocence claim is considerably more compelling than a simple denial of guilt.  As demonstrated at the PCRA hearing through the testimony of both Drs. Wecht and Doyle, Attorney Rudinski could have obtained expert testimony that would have conflicted with Dr. Mihalakis' testimony on how the taste of Roxanol can be disguised.  This testimony would not have been redundant as to Attorney Rudinski's cross-examination or closing argument, or unnecessary given the agreement on the bitter taste of Roxanol.  Had trial counsel consulted with and called an expert witness such as Dr. Wecht, he may have cast considerable doubt on Dr. Mihalakis' testimony, adding weight to the defense's contention that the manner of death was suicide.  Stated otherwise, such testimony would have provided an objective, knowledgeable opposition to Dr. Mihalakis' conclusions.  Given the significance of such expert testimony, Showers was prejudiced by her attorney's deficient performance.  There is a reasonable probability that Showers would not have been convicted had trial counsel presented such expert testimony.  *See Strickland*, 466 U.S. at 694.  Furthermore, the Court finds that this constitutional error

had a "substantial and injurious effect" in determining the jury's verdict.  *See Fry*, 127 S.

Ct. at 2328 (quoting *Brecht*, 507 U.S. at 631).

**e.      Analysis of Ineffective Assistance of Appellate Counsel**

As set forth above, Shower's claim of ineffective assistance of appellate counsel

must be examined under the same *Strickland* standards cited above: 1) counsel's

performance was unreasonable, and 2) counsel's unreasonable performance actually

prejudiced the defense.  *Strickland*, 466 U.S. at 687.  If there is no ineffective

assistance of counsel at the trial level, there can be no ineffective assistance of counsel

on appeal for failure to raise the same issue.  *See Jones*, 463 U.S. at 754.

Given this precedent, should a court find merit in a claim of ineffective assistance

of trial counsel, the logical conclusion is that any claim of ineffective assistance of

appellate counsel in failing to raise trial counsel's ineffectiveness should also have

merit.  As set forth above, this Court has found that trial counsel was ineffective in

failing to present expert testimony to rebut the Commonwealth's expert testimony on

the subject of the liquid morphine Roxanol.

At the PCRA hearing, Showers' appellate counsel, Mr. Costopoulos, testified as

to why he did not raise this issue on direct appeal.  In deciding to raise only eight issues

on direct appeal, Mr. Costopoulos stated, "We raised the issues we did because we

thought those issues had the most merit, and we decided not to shotgun the Appellate

Court with 15 issues and went with eight."  (Notes of Testimony, PCRA Hearing,

9/24/98 ("PCRA NT 9/24/98") 5.)  He did consider the failure to call an expert witness

an issue at the time of direct appeal, but performed no independent investigation on the

34

issue, instead relying solely on the record.  (*Id*. at 6.)  When asked if he believed the issue had merit and should have been raised, Mr. Costopoulos stated, "I believe that issue had merit at the time.  I believe it has merit at this time.  And if I had to do it over again, having lost on direct appeal with the issues I had raised, I absolutely would have raised it."  (*Id*.)  Finally, when asked if not raising certain issues was a tactical decision, Mr. Costopoulos stated, "There was a reason why we didn't; and if that is tactical, then you could call it tactical."  (*Id*. at 11.)

Both the PCRA court and the Superior Court found that, based on his strategic decision to pursue only eight issues, appellate counsel was not ineffective for failing to raise this issue on direct appeal.  The Superior Court further found that he was not ineffective because "[n]one of the allegations of error raises an issue of significant arguable merit."  *Showers II*, 782 A.2d at 1019.  However, after review of the issue set forth above, this Court has concluded that trial counsel was, in fact, ineffective for failing to present expert rebuttal testimony.  In doing so, the Court concluded that there is a reasonable probability that the jury's verdict would have been different if Showers' trial counsel had presented such rebuttal expert testimony.  Because this claim has merit, the Court finds that there is a reasonable probability that Showers' direct appeal would have been successful had appellate counsel adequately raised this issue.  Therefore, appellate counsel's failure to raise the issue on direct appeal was unreasonable and did prejudice the defense.  *Strickland*, 466 U.S. at 687.

## CONCLUSION

For the foregoing reasons, the Court will grant habeas corpus relief on Showers' claim of ineffective assistance of counsel for failing to present expert testimony to rebut

the Commonwealth's expert witness testimony with respect to the characteristics of the liquid morphine Roxanol.  The proper relief in this case is to grant the writ, vacate Showers' conviction, and remand in order to allow the Commonwealth of Pennsylvania to retry Showers within a reasonable time of the accompanying Order.

An appropriate Order follows.


s/ A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge

November 12, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JUDY ANN SHOWERS,** | : | |
| | : | |
| **Petitioner** | : | **NO: 3:CV-03-2264** |
| | : | |
| **v.** | : | **(Judge Caputo)** |
| | : | |
| **JEFFREY BEARD, Commissioner, Pennsylvania Department of Corrections; MARTIN DRAGOVICH, Warden of the State Correctional Institution at Muncy,** | : : : : : | |
| | : | |
| **Respondents** | : | |

## ORDER

**AND NOW, this 10ᵗʰ day of November, 2008,** upon consideration of the petition for writ of habeas corpus (Doc. 1), the complete record in this case, and the reasons set forth in the accompanying Memorandum, **IT IS HEREBY ORDERED AS FOLLOWS**:

1.   The petition for writ of habeas corpus (Doc. 1) is **GRANTED** as to Petitioner's Claim I;

2.   Petitioner's conviction for first-degree murder in *Commonwealth v. Showers*, No. CR-93-402, 1994 (Barry F. Feudale, J.), is **VACATED**;

3.   The execution of the writ of habeas corpus is **STAYED** for 180 days from the date of this Order, during which time the Commonwealth of Pennsylvania may conduct a new trial in a manner consistent with this Memorandum and Order;

4.   In accordance with 28 U.S.C. § 2253(c)(2), a certificate of appealability is **GRANTED** as to Petitioner's Claim I;

5.   If either party files an appeal to the United States Court of Appeals for the

Third Circuit, this Order will be stayed.

6.    The Clerk of Court is directed to **CLOSE** this case.


s/ A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge